Robert C. BRAY

v.

The UNITED STATES.

No. 182–68.

United States Court of Claims.

May 14, 1975.
As Amended June 27, 1975.

Neil B. Kabatchnick, Washington, D. C., Atty. of Record, for plaintiff. Thomas H. King, Washington, D. C., of counsel.

Leslie H. Wiesenfelder, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant.

Before COWEN, Chief Judge, and KASHIWA and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on exceptions by the parties to a recommended decision filed by Trial Judge Kenneth R. Harkins pursuant to Rule 134(h). The court has considered the case on the briefs and oral argument of counsel. Since the court agrees with the trial judge's recommended decision, as hereinafter set forth,* it hereby affirms and adopts the same as the basis for its judgment in this case. It is therefore concluded that plaintiff is entitled to re-

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed March 6, 1974, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

cover active duty pay and allowances from July 3, 1962, to the end of his then current enlistment term, March 13, 1964, and judgment is entered for plaintiff to that effect with the amount of such recovery to be determined pursuant to Rule 131(c). On final order, an appropriate remand will be entered directing the Secretary of the Air Force to expunge all documents relative to plaintiff's invalid dismissal and to correct plaintiff's official military records.

## OPINION OF TRIAL JUDGE

HARKINS, Trial Judge:

On July 3, 1962, plaintiff was discharged involuntarily for unfitness as a Class II homosexual from the Air Force prior to the expiration of his term of enlistment. His type of discharge precluded reenlistment. At the time of his discharge, plaintiff held the rank of staff sergeant, E–5, and had served a total of 17 years, 2 months, and 21 days of active military service in Korea, Japan, Okinawa, Germany, and Alaska. Plaintiff's term of enlistment would have expired on March 13, 1964; if he had continued in the military forces, his 20 years of active service for retirement eligibility would have ended on or about April 13, 1965. Plaintiff contests the validity of his involuntary discharge, and seeks judgment for active duty pay and allowances as a staff sergeant from July 3, 1962, to April 30, 1965; for the retired pay of a staff sergeant, computed on the basis of 20 years of active service, from May 1, 1965; and for correction of his military records to reflect reinstatement, reenlistment, and retirement.

Plaintiff's petition was filed on June 17, 1968, 16 days before the 6-year statute of limitations would have expired. In its answer, defendant asserted that plaintiff's claim was barred under the doctrine of laches, but defendant has not pursued this defense and has not made the required showing of prejudice.[1] The laches defense is deemed to be abandoned.

At issue is whether the action of the Secretary of the Air Force in effecting plaintiff's discharge violated minimum concepts of basic fairness and is invalid because the Air Force failed to comply with applicable regulations in its investigation and determination of the allegations against plaintiff. Defendant, also, puts at issue whether, in the circumstances of this case, plaintiff was entitled to a de novo hearing in this court on the propriety of his discharge.

The procedures employed by the Air Force do not satisfy the requirements of applicable regulations. The Secretary's approval of the recommendation to discharge plaintiff, accordingly, is invalid. In addition, inclusion of materials in the summaries prepared for the use of the Air Force Discharge Review Board (AFDRB) and the Air Force Board for the Correction of Military Records (AFBCMR) that had been discredited and excluded in the proceedings of the board of officers tainted each of the subsequent reviews and prejudiced plaintiff's right to fair and objective review proceedings.

The findings of fact detail the facts relevant to resolution of the issues of this case. The following statement summarizes those facts to the extent necessary to put the decision in perspective.

Plaintiff was stationed in Alaska from October 3, 1960, to June 30, 1962, with duty as a personnel specialist in Headquarters, 5010th Air Base Wing (ABWg) at Eielson Air Force Base. After December 4, 1961, plaintiff was in Headquarters, 5010th Air Base Group (ABGp), with his principal duty as the Test NCO, Classification and Testing Section, Headquarters, 5010th ABWg.

On November 17, 1961, the Office of Special Investigations (OSI), Detachment 8101, at Eielson AFB, commenced an investigation of plaintiff for alleged homosexual tendencies, at the request of the Air Police Division, 5010th ABGp. This investigation led to the institution of proceedings under the provisions of AFR

---

1. Cason v. United States, 200 Ct.Cl. 424, 471 F.2d 1225 (1973).

35–66[2] and resulted in plaintiff's involuntary discharge. The reports of the OSI investigation are not in evidence. A document (OSI Summary), completed on October 3, 1962, by an examiner of the Secretary of the Air Force Personnel Council (SAFPC), for use in proceedings of the AFDRB is in evidence.

The OSI Summary discloses that allegations against plaintiff were made by three individuals, and were concerned with three separate incidents that were alleged to have occurred in plaintiff's room in the barracks on November 16, 1961, on November 17, 1961, and on an unspecified date in late October or early November 1961. Each of the individuals signed a written statement during the course of the OSI investigation, and the written statements were incorporated into the records of proceedings of the board of officers that resulted from the OSI investigation. The statement concerned with the November 16, 1961, incident (the Watts allegation) was made to the OSI special agent and was written and signed by Watts on November 20, 1961. The statement concerned with the late October-early November incident (the Kennedy allegation) was written by an OSI agent and was signed by Kennedy at an interview conducted on February 12, 1962. There is an ambiguity as to whether the statement concerned with the November 17, 1961, incident (the

Reep allegation) was written on November 24, 1961, or on January 24, 1962.

The allegations against plaintiff were investigated at two proceedings of a board of officers, convened pursuant to AFR 35–66. Watts did not testify at either board; Reep testified at the first board, but not at the second; and Kennedy testified at both board proceedings.

At the time of the board proceedings, plaintiff, who is black, was 35 years old and had been on active duty in the Army or Air Force since April 1945. During his entire service, plaintiff never had been subjected to any form of disciplinary action. There is no evidence that plaintiff at any time has committed or participated in an act of homosexuality, nor that plaintiff knowingly consorted with known homosexuals. There are only two incidents—those involved in the Watts and Kennedy allegations—where there is evidence that plaintiff may have acted in such a manner that an act of homosexuality may have been proposed.

The first board (1st board) proceedings were held on March 26–27, 1962, to investigate the allegation that plaintiff had homosexual tendencies, as defined by AFR 35–66, section B, paragraph 12b,[3] and to make findings and recommendations on whether plaintiff should be separated from the service as a Class II homosexual.

**2.** Discharge Processing Where Homosexual Acts or Tendencies Are Involved, Mar. 17, 1959.

**3.** The regulation provides:
"12. Classification of Cases. Cases are generally classified as follows:

"a. *Class I.* Those cases where a member of the Air Force has engaged in one or more homosexual acts accompanied by assault or coercion, as characterized by an act in or to which the other person involved did not willingly cooperate or consent, or where the consent was obtained through force, fraud, or actual intimidation or where the homosexual act was committed with a minor, regardless of whether the minor cooperated.

"b. *Class II.* Those cases where a member of the Air Force has engaged in one or more homosexual acts, or has proposed or attempted to perform an act of homosexuality which

does not fall into the Class I category. It is emphasized that no distinction is made in the administrative handling of cases of alleged participation in homosexual acts based upon whether the role of the person in any particular act was active or passive.

"c. *Class III.*

"(1) Those cases where a member of the Air Force exhibits, professes, or admits to homosexual tendencies, or habitually associates with persons known to him to be homosexuals, but there is no evidence that he had, *while a member of the Air Force*, engaged in one or more homosexual acts, or has proposed or attempted to perform an act of homosexuality.

"(2) Those cases where a member, *prior to becoming a member of the Air Force*, exhibited, professed, or admitted to homosexual tendencies, or habitually associated with persons known to him to be homosexuals, or who engaged in one or more homosexual acts, or proposed or attempted to perform an act of ho-

The findings and recommendation of the 1st board have been excised from the transcript of the proceedings. Trial in this court, however, established the 1st board found that plaintiff was a Class II homosexual and recommended plaintiff's retention in the service. By letter dated May 15, 1962, plaintiff was notified that the Commander, Alaskan Air Command (AAC), had disapproved the findings and recommendation of the 1st board and had directed that a new board be appointed. No reasons were given for the commander's disapproval of the findings and recommendation of the 1st board.

Proceedings of the second board of officers (2d board) took place on May 17–18, 1962. The presiding officer of the 2d board was the assistant administrative officer of the 5010th ABGp, who, in the absence of the group commander, at times served as acting group commander. In the period between the commencement of the OSI investigation and the 2d board proceeding, the president of the 2d board, on occasion, had been plaintiff's acting commanding officer with supervisory authority over plaintiff. In addition, the president of the 2d board, on May 17, 1962, had signed the endorsement to a notice dated May 16, 1962, to plaintiff from Wing Headquarters that the findings and recommendation of the 1st board had been disapproved.

The 2d board rejected, as not germane, the incident involved in the Reep allegation and accepted as valid the Watts and Kennedy allegations. The 2d board found that plaintiff did propose, or attempted to propose, an act of homosexuality as defined in AFR 35–66, section B, paragraph 12b, and a majority of the board recommended the issuance of a general discharge under AFR 39–17 (unfitness). A minority of the board recommended the issuance of an honorable discharge. On June 19, 1962, the Commander, AAC, approved the findings and recommendation of the 2d board and directed that plaintiff be given a general discharge.

Plaintiff applied three times to the AFDRB to have the proceedings leading to his discharge reconsidered and to request changes so that he could be permitted to reenlist. Plaintiff, represented by counsel, appeared before the AFDRB at hearings on January 3, 1963, on May 19, 1966, and on September 6, 1967. After each proceeding, the AFDRB found that plaintiff had been properly discharged, that the type of discharge was equitable and proper, and denied plaintiff's requests for corrective action to permit reenlistment.

Plaintiff appealed two times, on February 4, 1963, and on July 13, 1966, to the AFBCMR to request that his records be corrected to permit reentry into the Armed Forces. On both occasions, plaintiff's applications were denied without a hearing.

Each of the allegations against plaintiff on proposed acts of homosexuality involved separate but similar facts. Each incident was alleged to have occurred in plaintiff's room in the barracks, at night, and to have involved a note or a writing in which the act was proposed. None of the incidents involved verbal discussion of the alleged proposed act. Plaintiff denied the existence of either the meeting or the writing in the Reep allegation. Plaintiff acknowledged that he wrote the notes involved in the Watts and Kennedy allegations. Throughout all of the Air Force investigation and proceedings, and at trial, plaintiff has contended the writings were his personal notes of material to be included in a "party tape" of dirty jokes and were not intended to be propositions to engage in acts of homosexuality.

The incident in the Watts allegation took place on November 16, 1961. Watts, a black, was an airman in the Air Police Division and was considered by plaintiff to be a good friend. Plaintiff had administered Specialty Knowledge

mosexuality, but there is no evidence that he has, *while a member of the Air Force*, engaged

in or proposed or attempted to perform an act of homosexuality."

Tests to Watts three times in 1961: a "3 level" test that Watts passed and a "5 level" test in May that Watts had failed, and the retest in October. On November 14 or 16, 1961, plaintiff telephoned Watts, told him his score on the October test, and asked Watts to come to his room to discuss the paperwork involved in an upgrading to level 5. Disclosure of Watts' score before it was publicly available would have been a breach of regulations.

In his statement to the OSI, Watts said he reported plaintiff's call to the Air Police operations officer and was referred to an Air Police investigator. On November 16, 1961, Watts talked with the Air Police investigator, who had him call plaintiff and arrange to meet in plaintiff's room between 9 and 10 p. m. The Air Police investigator secured a wire recorder from the state police, which he had Watts conceal under his jacket, so Watts could record any conversation that took place. The Air Police investigator accompanied Watts to plaintiff's quarters and stationed himself in the hallway outside. At approximately 10 p. m., Watts entered plaintiff's room. Plaintiff was in bed, wearing shorts, a "T" shirt, and a bathrobe, and was watching television. Watts kept on his outdoor gear, refused an offer to sit down, and left the door open. Watts picked up a yellow-lined piece of paper from plaintiff's desk, table, or from the foot of the bed, started reading, and started to back out of the room. Plaintiff reached for the paper, but did not leave the bed or follow Watts into the corridor. Watts came out of the room, handed the Air Police investigator the yellow-lined paper, said he thought there had been a failure, and that plaintiff had not said anything out of line that could be recorded.

In his statement to the OSI, Watts said that plaintiff handed the note to him to read. Throughout all the proceedings, plaintiff has vigorously denied handing Watts the note, and has claimed that the note was written prior to Watts' entry into the room.

Standing alone, the note involved in the Watts allegation can be interpreted to be a proposition to engage in a homosexual act. It also can be interpreted to be material for a "dirty joke." The 2d board did not consider the intent of the note to be a joke or in fact to have any humor at all. The 2d board supported this conclusion by a finding that the content of the note did not appear on the "party tape." In this finding, the 2d board erred. The text of the note, in virtually identical language, identified as "The Dingler," is included in the material on the "party tape."

Watts departed Eielson AFB on rotation on February 20, 1962, and was not in Alaska at the time of the 1st board proceeding. Watts' departure occurred 12 days after plaintiff received (February 8, 1962) the AFR 35–66 letter of notification from the commanding officer and 1 day before the commander reported (February 21, 1962) the results of the OSI investigation to Wing Headquarters and recommended that plaintiff be separated from the service as a Class II homosexual. Although Watts departed Alaska on February 20, 1962, he was not released from active duty until March 6, 1964.

The Kennedy allegation stems from an OSI search of plaintiff's room on November 20, 1961. The OSI agents found 15 scraps of paper in the bureau drawer that, when reassembled, formed an envelope that had plaintiff's handwriting on each side. Plaintiff has acknowledged that he had torn the envelope and thrown the pieces in the bureau drawer after he had shown the writing to Kennedy on a Saturday night in late October or early November 1961.

The writing on one side was addressed to "Ken" and asked a question about a "peppermint stick." There were blanks, designated "yes" or "no," to be marked by a checkmark. The other side of the envelope had an explanation of the question. A checkmark had been inserted in the blank marked "no." Standing alone, the language on the envelope involved in

the Kennedy allegation can be interpreted to be a proposition to engage in a homosexual act. It also can be interpreted to be material for a "dirty joke." The 2d board concluded that the writing in the Kennedy allegation was not a joke but, in fact, was a proposition to engage in a homosexual act. Kennedy, in his written statement and in his testimony at each board hearing, stated he believed that the writing on the envelope was a proposition to engage in a homosexual act. Plaintiff, at all stages, has contended he only intended to test Kennedy's reaction to a dirty joke. The transcript of the "party tape" includes material on "The Peppermint Stick" in virtually identical language as that in the writing on the envelope that was shown to Kennedy.

The circumstances in which plaintiff handed the envelope to Kennedy bear upon the intent of the parties in the incident. Kennedy happened to be in plaintiff's room through a series of coincidences and, prior to that night, was virtually unknown to plaintiff. Kennedy is white. On the night of the incident, a group of men from Fort Wainwright had attended a service club show at Eielson AFB, but were prevented from returning to Fort Wainwright by car trouble. A casual friend of plaintiff's, Leonard Dean, who was one of the group, asked plaintiff to use his car to help start the stalled car. Unsuccessful in starting the car by pushing or by jumper cables, the group went to plaintiff's room to get warm, and, in the discussion that followed, plaintiff was asked to drive the group back to Fort Wainwright, a distance of from 24 to 26 miles. Plaintiff agreed on the condition that somebody would return with him so that there would be two people in the car in the event of a breakdown. The person who agreed to accompany plaintiff back, at first, was Dean. Later, Kennedy agreed to make the journey and to make the return trip to Fort Wainwright by bus.

During the return to Eielson AFB, which took about 30 minutes, Kennedy noticed that the bus on which he was to go back to Fort Wainwright had broken down. During the return trip, plaintiff and Kennedy engaged in general discussion of topics unrelated to sexual matters, and no sexual overtures or propositions were made or discussed.

After returning to Eielson AFB, Kennedy and plaintiff went to plaintiff's room to get warm, and Kennedy asked if he could spend the night. Plaintiff told Kennedy he could sleep there, put clean linens on his own bed for Kennedy, and secured a mattress from storage which he put on the floor to sleep on himself.

Plaintiff and Kennedy were in the room for 1 or 2 hours, during which time, for the most part, they watched television. There were no sexual overtures made or discussed. While Kennedy was watching the late show on television, plaintiff wrote the word "Ken" on the note and handed it to Kennedy. Plaintiff contends that the envelope already had writing on both sides when he handed it to Kennedy. Kennedy testified that there was writing on only one side when the envelope first was handed to him. Kennedy read the note, checked the blank marked "no," handed it back, and said "I don't quite understand what you are driving at." Plaintiff then said "Did you look at the back?" and gave the note back to Kennedy, who read the back and placed the note on the television. According to Kennedy, plaintiff wrote the language on the back of the note in explanation of the question before returning the envelope to him.

At the time, Kennedy did not pay too much attention to the note and was not disturbed by the incident. Plaintiff's reaction was to chuckle or snicker a little bit. When plaintiff showed the envelope with the writing to Kennedy, he did not touch Kennedy in any manner nor did he say anything nor do anything other than to hand him the note which could constitute a suggestion to engage in a homosexual act.

Within 5 minutes, plaintiff went to bed and Kennedy continued to watch the late show until it was over. Plaintiff

awoke around 6 a. m. and awakened Kennedy by tapping him on the shoulder. Kennedy dressed and plaintiff gave him a dollar for bus fare back to Fort Wainwright.

The Reep allegation involved an incident that was supposed to have occurred shortly after midnight, November 17–18, 1961. Reep, who is white, testified at the 1st board proceeding, but did not testify at the 2d board; Reep's statement to the OSI special agent was incorporated into the record of each board proceeding. Plaintiff's testimony and supporting evidence at the 1st and 2d boards established that the incident could not have occurred at the time alleged because plaintiff was in Fairbanks, Alaska. For this reason, the Reep allegation was not accepted by the 2d board and was found not to be germane to proceedings against plaintiff. The incident described in Reep's statement to the OSI special agent has no support in this record and the credible evidence supports the conclusion that no meeting with plaintiff, as described by Reep, in fact occurred, and there is no evidence that a writing, as described in Reep's statement and alleged to have been handed to Reep by plaintiff, ever existed. Evidence in the record supports the conclusion that plaintiff did not make such a writing and, in fact, that such a writing did not exist. The writing attributed to plaintiff by Reep, as described in his statement, differs in nature and content from the writings involved in the Watts and Kennedy allegations, which plaintiff admits to have authored. The transcript of the "party tape" does not contain any material that is comparable to the writing described in Reep's statement.

## I.

Throughout this proceeding, defendant has asserted that a trial de novo was not warranted in the circumstances of this case. During pretrial, the trial judge denied defendant's motion that no oral testimony be permitted and that the case be decided only on the basis of the administrative decisions and records. Defendant's motion to review the trial judge's order was denied by the court on March 19, 1971. At trial, defendant's objection to the receipt of new testimony and evidence was overruled, and defendant declined to cross-examine plaintiff or to present new evidence. In its brief, defendant again presents the issue that plaintiff was not entitled to a de novo hearing and that any judicial review must be limited to the administrative record.

In military pay cases such as this judicial review is not limited to the administrative record as defendant argues. Plaintiff, in this court, is entitled to a trial on the merits, as a matter of right, so that he may have a judicial determination of the disputed factual issues involved in his claim.[4] In contrast to the situation in the contract cases cited by defendant, which limit judicial review to the administrative record, plaintiff has not contracted away his right to a judicial decision.[5]

In addition to removal of the case to a judicial forum from the purely administrative bodies that are designed to make recommendations for the exercise of military command discretion, the de novo proceeding in a military pay case generally elicits evidence that is new to the case. In this case, at trial plaintiff presented testimonial and documentary evidence that was not available for consideration in the Air Force proceedings. Of particular significance is the testimony of a member of the 1st board relative to the findings and recommendation that were excised from the transcript of the proceedings for the 2d board, as well as

---

**4.** Brown v. United States, 184 Ct.Cl. 501, 396 F.2d 989 (1968); Beckham v. United States, 179 Ct.Cl. 539, 375 F.2d 782, petition for writ of certiorari dismissed by stipulation, 389 U.S. 1011, 88 S.Ct. 583, 19 L.Ed.2d 613 (1967), 183 Ct.Cl. 628, 392 F.2d 619 (1968).

**5.** Montiila v. United States, 198 Ct.Cl. 48, 57, 457 F.2d 978, 983 (1972).

the testimony of plaintiff's medical expert with respect to plaintiff's psychiatric history for the period between October 1967 and November 1971.

■ In the trial de novo, deference is accorded the judgment and expertise of the administrative decision-maker by limiting judicial intervention only to those instances where the administrative decision, on the basis of all the evidence, was arbitrary, capricious, unsupported by substantial evidence, or inconsistent with applicable statutes or regulations. The substantial-evidence standard applies to review of the administrative decision, and the acceptance of new evidence has not encroached upon the administrative process.[6]

■ Evidence, to be substantial, must be evidence that would convince an unprejudiced mind of the truth of the facts to which it is directed. The substantial-evidence standard gives precedence to the administrative rulings when the record is viewed with the de novo evidence included in the whole.[7] The court has stated:

> Reasonable inferences fairly drawn from the evidence are for the administrative tribunal. Where two equally reasonable but contrary inferences might be drawn from the record and each could be sustained as supported by substantial evidence, the one adopted by the Board should be sustained. Moreover, where conflicting testimony is in the record, the Board's preference will, generally, not be disturbed unless we can conclude that the findings are not supported by some evidence which qualitatively and, in appropriate circumstances, quantitatively, can be deemed substantial evidence when the record is viewed as a whole.

■ Reception of de novo evidence in this case was appropriate. The delicate and agonizing appraisal of all of the evidence, to resolve the merits of the Air Force findings that plaintiff had, in fact, proposed acts of homosexuality, and thus was a Class II case under AFR 35–66, however, is not required. Barracks or locker room humor is a difficult concept. It generally is sexual in nature and frequently is depraved and scatological. What is humorous depends much on circumstance and audience, and action connoted by the plain meaning of words employed is not necessarily implied and does not necessarily result. A most severe stigma attaches in our culture to male homosexuality; error in weighing the substantiality of the evidence that supports the Air Force findings could result in grave injustice. In this case, however, failure to comply with applicable regulations and procedural error are of such magnitude that the Secretary's decision cannot stand. Plaintiff is presumed innocent and only may be removed in the manner prescribed.[8]

## II.

AFR 35–66 defines the procedures that apply to processing allegations that an airman is a homosexual. A board of officers convened under AFR 35–66 is required to conform, in addition, with the procedures established in AFR 11–1.[9]

The heading of AFR 35–66 declares that the regulation establishes procedures for processing three categories of Air Force personnel: Members who (1) engage in homosexual acts, (2) possess established and confirmed homosexual tendencies, or (3) habitually associate with individuals known to them to be homosexuals. The definitions for Class I, Class II, and Class III cases follow

**6.** Brown v. United States, *supra* note 4, 184 Ct.Cl. at 504, 396 F.2d at 992; Beckham v. United States, *supra* note 4, 179 Ct.Cl. at 543–44, 375 F.2d at 785.

**7.** Koppers Co. v. United States, 186 Ct.Cl. 142, 149, 405 F.2d 554, 558 (1968).

**8.** Glidden v. United States, 185 Ct.Cl. 515, 528 (1968).

**9.** AFR 11–1, Administrative Practices, Boards of Officers for Conducting Investigations, Dec. 29, 1953, as amended.

these three categories. The definition of a Class II case (*supra* note 3) literally applies to a single incident where an act of homosexuality is proposed or attempted. To give meaning to the second category described in the heading, cases in Class II, even though one incident may be sufficient for a classification of the case, should also show for the purposes of discharge that the person so charged possessed "established and confirmed" homosexual tendencies. This requirement is reinforced by the provisions in AFR 35–66, paragraph 20d, that permit a board of officers to recommend retention of an airman in a Class II case.

Paragraph 3 of AFR 35–66 announces four policy statements on homosexuality. Under these policies, a proposal to participate in a homosexual act is considered "a very serious misbehavior" and no distinction is made between an incident on duty time and an incident on off-duty time. It is the general policy of the Air Force to discharge members who fall in any of the Class I, II, or III cases. Although exceptions may be authorized to permit retention, such authorization is permissible "only where the most unusual circumstances exist, and provided the member's ability to perform military service has not been compromised." Extensive military service alone does not warrant an exception.

Where investigation indicates that a case is in Class II and a general court-martial is not appropriate, if a hearing is requested, the regulation requires an airman's case to be referred to a board of officers. The functions and duties of the board of officers are purely administrative and pertain to airmen cases only.

Primarily, the board of officers is a fact finding and recommending body with the primary duty to develop and review all relevant information.[10]

Paragraph 20 details board procedures and subparagraph "d" requires the board to announce its findings and recommendation to the airman and his counsel. When the board finds that the airman's case is in Class II, it may recommend (a) that the respondent be discharged and furnished an undesirable, general, or honorable discharge, as appropriate, or (b) that the respondent be retained in the service.

AFR 35–66 defines with particularity the action higher authority may take with respect to board findings and recommendations. If the board of officers has recommended that the respondent be discharged as a Class II case, paragraph 20b(1) authorizes the discharge authority to approve the discharge or to approve retention in the service if retention is deemed appropriate. If the board, however, has recommended that the respondent be retained in the service, the discharge authority only "may approve that recommendation and may not approve discharge."[11]

Paragraph 21 provides a procedure for the discharge authority to set aside the board's findings and recommendations and to direct appointment of a new board of officers. This procedure may be invoked if the findings of the board are not consistent with the facts in the case or if the recommendations of the board are not consistent with the findings. An amendment, effective January 12, 1961, requires that the decision to set

---

10. Paragraph 17, in full, provides:

"17. Functions and Duties. The functions and duties of a board of officers convened under this regulation are purely administrative and pertain to airmen cases only, as officer cases are processed for final action under AFR 36–12 or AFR 36–2, as appropriate. Primarily, this is a fact finding and recommending board; it is not limited to the consideration of the file initially presented. The primary duties of the board are to develop and review all information concerning the matter under considera-

tion; to arrive at clear, logical, findings of fact and conclusions; and to recommend, on the basis of these findings and conclusions, what action should be taken in the case (see paragraph 20d)."

11. Paragraph 21b(5) reads as follows:

"(5) If the board has recommended that the respondent be retained in the service, the discharge authority may approve that recommendation and may not approve discharge."

aside the initial proceedings "must be supported by a demonstrable inconsistency between the evidence in the case and the board's findings or between its findings and recommendations." [12] Mere disagreement with the board's findings is not sufficient to authorize the discharge authority to set the board's findings aside.

Plaintiff was present when the 1st board announced its findings and recommendation. Plaintiff testified the 1st board found that he was a Class II homosexual and recommended that he be retained in the service. [13] A member of the 1st board testified at trial that he had a specific, clear, and independent recollection that the board of officers recommended plaintiff's retention in the service, but could not recall whether the board had found that plaintiff was a Class II homosexual. The findings and recommendation of the 1st board, in accordance with the requirements of AFR 35–66, paragraph 21b(7), were excised from the transcript and, accordingly, are not included in the administrative record.

■ When the Commander, AAC, disapproved the 1st board's findings and recommendation and directed appointment of a new board of officers to hear and consider the case, no reason was given. There is nothing in the administrative record, and nothing was presented at trial, to satisfy the requirement of paragraph 21b(7) that the "decision to set aside the initial proceedings must be supported by a demonstrable inconsistency between * * *." Failure to comply with this requirement, alone, would be sufficient to make the action of the discharge authority an abuse of the command function and would render invalid subsequent proceedings leading to plaintiff's discharge.

AFR 35–66, paragraph 20d, permits the board, when it finds a Class II case, to recommend that the airman be either discharged or retained. Accordingly, the 1st board's findings and recommendation are not demonstrably inconsistent on their face. Further, evidence in the 1st board's record could support such findings and recommendation. Accordingly, the evidence and the 1st board's findings, on the record, are not demonstrably inconsistent. At a minimum, some statement from the Commander, AAC, in explanation of his action is essential for compliance with the requirements of AFR 35–66.

Disposition of the Watts allegation in the Air Force proceedings provides, another instance of failure to comply with the requirements of applicable regulations. Paragraph 8 of AFR 35–66 applies to the separation or reassignment of military witnesses essential to board proceedings. It requires the commanding officer of an airman under investigation to ascertain the separation or reassignment status of any essential military witness. An essential military witness normally will not be reassigned until the case is closed or his presence is no longer required. [14]

---

12. Paragraph 21b(7), as amended, reads as follows:

"(7) If the findings of the board are not consistent with the facts in the case, or the recommendations of the board are not consistent with the findings, the discharge authority may set aside the board's findings and recommendations and direct that a new board of officers be appointed to hear and consider the case. The decision to set aside the initial proceedings must be supported by a demonstrable inconsistency between the evidence in the case and the board's findings or between its findings and recommendations. A mere disagreement with the board's interpretation of the evidence, or with its recommendations, will not

operate to authorize the exercise of this authority. When proceedings of the first board are set aside, no voting member of the new board may have been a member of the first board. If a new board is appointed the proceedings of the first board, less the findings and recommendations, will be forwarded to the new board for its information and consideration."

13. In Requested Finding of Fact No. 50, defendant concurred.

14. Paragraph 8 reads, in part, as follows:

"8. * * * To provide for the availability of essential military witnesses in the event of board action, the immediate commander will

Separation of an essential witness is prohibited until the case is closed or his presence is no longer required. In the event a witness is not available to testify in person, paragraph 8c requires him to be contacted for his affidavit or deposition. In such a case, "the action of the convening authority will contain a complete explanation and justification for the use of an affidavit or deposition."

■ Watts was not available to testify at either of the board proceedings. He departed from Eielson AFB on rotation on February 20, 1962, and was not in Alaska at the time of the 1st board proceeding. Watts' departure from Alaska in 1962 was not due to any imminency in the expiration of his term of service because he was not released from active duty until March 6, 1964.

Watts was the air policeman whose complaint first gave rise to an investigation of plaintiff. Watts' visit to plaintiff's room on November 16, 1961, was at the behest of a sergeant in the Investigation Section of the Air Police Division to secure information for use against plaintiff. The factual details that surround acquisition of the note by Watts, which note plaintiff admits having written, have been in controversy throughout this case. Plaintiff had no opportunity at any stage of the Air Force proceedings to cross-examine Watts on any record as to these facts, as well as upon the facts that comprised the telephone conversations between Watts and plaintiff that preceded Watts' visit to plaintiff's room on November 16, 1961. No explanation or justification for the use of the Watts' statement is given in the record, other than the assertion that Watts was no longer available in Alaska. No attempt was made, after the commanding officer's February 8, 1962, notice to plaintiff under AFR 35–66, or after the February 21, 1962, recommendation that plaintiff be separated as a Class II homosexual, to have Watts ex-

amined by deposition at his new post or to secure his affidavit. The statement Watts made to the OSI special agent on November 20, 1961, was a statement obtained during the course of an investigation and is not the "affidavit or deposition" required by paragraph 8c of AFR 35–66.

Failure of plaintiff's appointed military counsel in the first hearing to object to Watts' nonavailability and his failure to request Watts' appearance do not excuse noncompliance with the requirements of AFR 35–66. The circumstances surrounding the November 16th visit to plaintiff's room to obtain evidence, and in the light of the number of other irregularities in the Air Force proceedings in this case, the timing of Watts' departure on rotation from Alaska, and his resulting unavailability as a witness, underscore the need for strict compliance with required procedures.

The note obtained by Watts is one of two alleged proposals on which the 2d board based its recommendation for plaintiff's discharge. It emphasizes the essentiality of Watts as a witness. Failure of the Air Force in its proceedings to permit plaintiff to elicit, by cross-examination, relevant material facts on this note prejudiced plaintiff's ability to defend himself.

The significance of the facts surrounding the note acquired by Watts is shown by the 2d board. If plaintiff had been able to establish on the record that Watts picked up a note already written, as plaintiff contends, he may have been able to satisfy the 2d board that the note was in fact material for a joke. As it was, the 2d board based its acceptance of the validity of the Watts' allegation on its determination that the text of the note was not a joke.

■ The foregoing failures in the Air Force proceedings to comply with applicable regulations are fatal defects in the administration of plaintiff's dis-

promptly determine the separation or reassignment status of each such witness.

"a. A witness normally will not be reassigned from the jurisdiction of the major air

command until the case under this regulation is closed or his presence is no longer required."

charge. The law is well-established that an agency is bound by its own regulations.[15] When the procedures followed ignore pertinent procedural regulations or violate minimum concepts of basic fairness, a discharge issued to a serviceman prior to the expiration of his enlistment term is void.[16]

The OSI Summary completed October 3, 1962, purports to summarize four OSI reports which are not in evidence in this proceeding. The OSI Summary is a part of the administrative record and was included in the information available for use in each of the AFDRB and AFBCMR proceedings involved in plaintiff's case. The OSI Summary incorporates a digest of Reep's statement to the OSI agent and includes a paraphrase of a note allegedly written by plaintiff that is part of the Reep allegation. Reep's testimony, his statement, and the writing he attributed to plaintiff were discredited at the 2d board hearing and eliminated from the charges against plaintiff.

▆▆ Notwithstanding the 2d board's elimination of the writing involved in the Reep allegation, the writing and the incident have been continuously renewed at each stage of plaintiff's efforts to defend himself. Defendant, at trial and in posttrial briefs, reasserts the credibility of the Reep allegation and the alleged note as viable in justification of the Air Force action. Information that lurks in the record when it properly should have been excluded is prejudicial.[17] The writing involved in the Reep allegation, by incorporation in the OSI Summary, tainted each of the AFDRB and AFBCMR proceedings and effectively frustrated the 2d board's determination that Reep's statement and testimony were unreliable. The writing attributed

to plaintiff in the Reep allegation is inflammatory and is phrased explicitly as a proposition. Its continued inclusion for use in the subsequent proceedings clearly was prejudicial. It differs in content and style from the two notes plaintiff admittedly authored for use in preparation of a "party record."

The Reep allegation was excluded by the 2d board; the Watts allegation should be excluded because he was not available for cross-examination as required by AFR 35–66 and AFR 11–1. The Kennedy allegation, standing alone, hardly would be sufficient to establish that plaintiff proposed or attempted to propose a homosexual act, as required for a Class II case under AFR 35–66.

In addition to violation of provisions in the regulations, there are an uncommon number of other errors or irregularities in the Air Force proceedings against plaintiff. Some of these irregularities are minor in nature; others are more significant. Taken together, however, these additional procedural errors and irregularities emphasize doubts that the Air Force proceedings possess the requisite elements of basic fairness.[18]

▆▆ The president of the 2d board, in the interval between the institution of the investigation against plaintiff and the 2d board proceeding, had been plaintiff's acting commanding officer and had supervisory authority over plaintiff. The president of the 2d board, also, had endorsed the May 16, 1962, notice to plaintiff that the findings and recommendation of the 1st board had been disapproved. At the beginning of the 2d board hearing, the president, under oath, disclaimed any previous knowledge of the facts involved in plaintiff's case or of the results of the previous board hearing. A greater sensitivity for the ap-

**15.** Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); Cason v. United States, *supra* note 1, 200 Ct.Cl. at 433, 471 F.2d at 1230.

**16.** Waller v. United States, 198 Ct.Cl. 908, 913, 461 F.2d 1273, 1276 (1972); Birt v. United States, 180 Ct.Cl. 910, 913 (1967).

**17.** Glidden v. United States, *supra* note 8, 185 Ct.Cl. at 526.

**18.** Birt v. United States, *supra* note 16, 180 Ct.Cl. at 913; Clackum v. United States, 148 Ct.Cl. 404, 296 F.2d 226 (1960).

pearance of fairness would have avoided creation of circumstances in which the president's impartiality was subject to challenge because of familiarity with plaintiff's case. In the circumstances, his service as president of the 2d board was inappropriate.

AFR 35–66 provides that the standard medical examination, recorded on Standard Form 88, Report of Medical Examination, is to include psychiatric consultation "if feasible." [19] Plaintiff's commanding officer on February 2, 1962, and on February 9, 1962, requested that plaintiff be given a medical and psychiatric evaluation for release from active duty under the provisions of AFR 35–66. Notwithstanding these requests, plaintiff was not examined by a psychiatric specialist. The medical doctor who examined plaintiff certified that he could "find no objective evidence of homosexuality" and testified that he had "insufficient evidence to make a definite diagnosis of a character disorder." No medical diagnosis was made in any of the Air Force proceedings that plaintiff was a homosexual or had homosexual tendencies.

Other irregularities in the record of the Air Force proceedings include an ambiguity as to whether Reep's statement was given on November 24, 1961, or January 24, 1962. There is also an ambiguity in the transcript of the proceedings of the 1st board. Presumably, the 1st board adjourned on March 27, 1962, after its findings and recommendation were read to plaintiff and his counsel. The transcript of the proceedings, however, states that the board closed on April 27, 1962, and adjourned on April 27, 1962, to meet at the call of the president.

### III.

Plaintiff seeks judgment for active duty pay and allowances as a staff sergeant from July 3, 1962, to April 30, 1965, and for the retired pay of a staff sergeant based on 20 years of active service from May 1, 1965. Upon entry of judgment for compensation, plaintiff also seeks further relief as authorized by Pub.L.No.92–415.[20] Plaintiff's discharge on July 3, 1962, was invalid. He is entitled to recover active duty pay for the period from his invalid discharge to the end of his then enlistment term, March 13, 1964. It cannot be said that plaintiff would have been reenlisted in 1964 and allowed to remain in the service until he had 20 years of active military duty. As a matter of law, plaintiff had no such right; the Air Force well might have refused to permit reenlistment.[21] In the circumstances of this case, however, plaintiff is entitled to an appropriate order of remand that requires defendant to expunge from the records of the Air Force all documents relative to his invalid dismissal.

### CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to

19. Paragraph 14 provides, in part, as follows:
"14. How Cases Will be Documented and Forwarded. * * * All other cases which fall within the purview of this regulation will be documented and forwarded, as follows:
"a. The basic letter will be prepared and forwarded within 10 days following receipt of a completed report of investigation, or an initial or interim report of investigation where paragraph 11 applies. Any delay will be fully explained. The letter will also contain the following information, and will have the enclosures indicated:
\* \* \* \* \* \*
"(11) Standard medical examination, recorded on Standard Form 88, 'Report of Medical Examination,' to include psychiatric consultation, in accordance with AFM 160–1, if feasible."

20. Act of August 29, 1972, Pub.L.No.92–415, 86 Stat. 652, and General Order No. 3 of 1972 of this court.

21. Davis v. United States, 196 Ct.Cl. 517, 523 (1971), cert. denied, 405 U.S. 1046, 92 S.Ct. 1313, 31 L.Ed.2d 589 (1972); O'Callahan v. United States, 196 Ct.Cl. 556, 560–63, 451 F.2d 1390, 1392–93 (1971); Clackum v. United States, 161 Ct.Cl. 34 (1963).

recover active duty pay and allowances from July 3, 1962, to the end of his then current enlistment term, March 13, 1964, and judgment is entered to that effect. The amount of recovery is reserved for further proceedings under Rule 131(c). On final order, an appropriate remand will be entered directing the Secretary of the Air Force to expunge all documents relative to plaintiff's invalid dismissal and to correct plaintiff's official military records.