**Harold E. SIX, Sr., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 04–1727 C.

United States Court of Federal Claims.

June 30, 2006.

William J. Kenney, Washington, DC, for plaintiff.

James D. Colt, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Deborah A. Bynum, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant.

*OPINION*

HEWITT, Judge.

Plaintiff, who states that he is the sole Processing and Reporting Room survivor of a torpedo attack on the U.S.S. Liberty while it was stationed off the coast of Gaza during the June 1967 Six–Day War between Israel and Arab forces, Administrative Record (AR) at 124, seeks correction of his naval records to reflect disability retirement on the basis of post-traumatic stress disorder (PTSD) and the back pay, allowances, and benefits that would flow therefrom, Compl. at 1–2, 36–37.

Plaintiff contends that, at the time of his discharge on February 6, 1973, he was suffering from PTSD and entitled to a 70% disability rating on the basis of symptoms caused by or aggravated by PTSD, Compl. at 34–35; AR at 82, 99, that the Navy should have transferred plaintiff to the Temporary Disability Retired List on February 6, 1973 in lieu of discharge and thereafter conferred on him permanent disability retirement status, Compl. at 37; AR at 82 (stating that "Six properly should have been transferred to the Medical Retired List in lieu of being discharged"); see 10 U.S.C. §§ 1201–12, and that the Board for Correction of Naval Records (BCNR) in its decision on August 25, 2003 erred by failing to consider his medical records and behavior subsequent to the attack when determining whether to correct his records because plaintiff was under a strict silencing order, a circumstance that resulted in the failure of plaintiff's records for the 1967–1973 time period accurately to reflect the symptoms of PTSD, AR at 89, 95–96.

## I. Background

### A. The Circumstances of Plaintiff's Injury

Plaintiff alleges the following facts about his service: Plaintiff, a cryptographer for the United States Navy with a Top Secret security clearance, was aboard the U.S.S. Liberty off the coast of Gaza during the June 1967 Six–Day War between Israel and Arab forces. Plaintiff's Counter Statement of Facts (Pl.'s Facts) ¶¶ 1, 11, 13. The U.S.S. Liberty was situated twelve miles off the coast of Israel, thereby respecting Israel's internationally recognized territorial waters line. Compl. at 3. The location of the ship was, however, within Israel's claimed territorial waters line, which extended 200 miles from its coast line. Id. Plaintiff alleges that the mission of the U.S.S. Liberty was to monitor Israeli communications to ensure that Israel did not launch a nuclear attack and to monitor Arab communications to ensure that Soviet personnel were not actively engaged in combat in support of Arab forces. Id. at 4. Plaintiff's duties included "destroy[ing] any and all classified documents if need be." AR at 123. Plaintiff's duty station was in the Processing and Reporting Room (PRR). Id.

On June 8, 1967, Israel Defense Forces attacked the U.S.S. Liberty in international waters. Pl.'s Facts ¶¶ 11, 13. During the attacks, plaintiff and some twenty-five of his fellow Naval Security Group (NAVSECGRU) members were in the PRR, located on the vessel's starboard (right) side, pursuant to an order to destroy the code books, classified materials and equipment which were located there. AR at 12–13, 112, 123–24; Compl. at 5; Pl.'s Facts ¶ 14. Before they had completed that task, plaintiff and his fellow NAVSECGRU members were warned to stand by for a torpedo attack on the starboard side. AR at 112; Pl.'s Facts ¶ 13. Plaintiff and two of his shipmates huddled in a corner between two desks. AR at 124. A torpedo hit the U.S.S. Liberty's starboard side and entered the PRR. Pl.'s Facts ¶ 13. The torpedo killed the men on either side of plaintiff and everyone else in the PRR. AR at 112, 124; Pl.'s Facts ¶ 15. Plaintiff states that he was the sole PRR survivor. AR at 112, 121, 124.

The U.S.S. Liberty sent out mayday messages. Compl. at 7. Approximately twenty hours after the attack, the U.S.S. America arrived to assist the wounded aboard the U.S.S. Liberty. Id. Plaintiff was evacuated by air to the United States Naval Hospital in San Diego, California via Bremerhaven, Germany. Id. While plaintiff was in the San Diego hospital, a Navy Lieutenant Commander otherwise not known to plaintiff visited plaintiff and ordered that he refrain from discussing any aspect of the events that occurred aboard the U.S.S. Liberty without prior written authorization from the commanding officer or the visitor himself and stated that failure to comply with this order would result in a court martial for breach of national security. Id. at 8; AR at 124–25; Pl.'s Facts ¶ 24. Plaintiff refers to the order he received from the Lieutenant Commander as a silencing order. E.g., Compl. at 8; AR at 95.

Plaintiff alleges that, while in the hospital, he began to experience vivid nightmares and flashbacks, but that he did not disclose the

fact that he was having nightmares or flashbacks to his attending physicians because "he could not do so without discussing the events on the Liberty." Compl. at 8–9; *see* AR 115 (stating that plaintiff could not tell examining physicians the truth because "[a] truthful answer would inevitably lead to discussion of the Liberty attack," which, plaintiff notes, "I was prohibited from discussing"); *see also* Declaration of Harold Eugene Six, Sr. (Six Declaration) ¶ 15 (stating that "I still feel I am violating orders when I discuss the Liberty, and, there is no way I can discuss the flash backs, the guilt, the anger and rage, without talking about the events of the Liberty"). Instead, plaintiff began drinking alcohol more heavily "to help control the nightmares and flashbacks." Compl. at 9. Starting in approximately September 1967, plaintiff also began to experience "episodes of indistinct pain affecting the right side of his face, under his eye, into the cheek, and, running under the ear into his neck." *Id.* at 10. The pain, which plaintiff alleges continues to this day, is "severe, 'like a hot poker.'" *Id.*

The Navy's Court of Inquiry investigated the attack on the U.S.S. Liberty and determined that the attack was a case of mistaken identity that ended once the ship was recognized to be a U.S. naval vessel. *Id.* Plaintiff contends, however, that the facts contained in the decision were false and that defendant purposely engaged in a cover-up operation to avoid "public outcry and public demand for retaliation against Israel if the true facts of the attack were revealed." *Id.* at 10–11 Plaintiff contends that, to effectuate this end, defendant prohibited U.S.S. Liberty crew members from testifying before the Court of Inquiry; that defendant, through the Navy, "brought the severely crippled ship back to Malta and isolated the crew . . . to keep the crew from talking to the press"; and that defendant applied pressure which resulted in the President of the Court of Inquiry issuing orders to the crew prohibiting them from

speaking about the events that occurred aboard the U.S.S. Liberty. *Id.* at 11; *see id.* (stating that counsel to the Court of Inquiry at the time of the inquiry into the attack "recently public[ ]ly acknowledged that he and the President of the Court were instructed as to the conclusions the Court was to reach and greatly pressured by White House and Pentagon authorities to reach those conclusions").[1]

Defendant's briefing does not address the foregoing allegations.

### B. Plaintiff's Subsequent Work History

Defendant and plaintiff both address plaintiff's work history subsequent to the traumatic events aboard the U.S.S. Liberty alleged by plaintiff. After plaintiff's release from the hospital, plaintiff was initially stationed in San Diego before being assigned to the NSA at Fort Meade, Maryland. Pl.'s Facts ¶ 36; Compl. at 13. Thereafter, plaintiff was transferred to the Philippines, where he volunteered to serve and did serve two separate tours of duty in Vietnam. Pl.'s Facts ¶ 36; Compl. at 13; AR at 73; *see also id.* at 64. Plaintiff alleges that he experienced "a dramatic . . . change in personality" during this period. Compl. at 22–24. In particular, plaintiff alleges that he had become alcohol-dependent; "was losing control of his family's finances"; "had become a violent abuser of his wife and children"; had "fights outside the home with other service members," and inside the home with his wife, leading to visits by the Shore Patrol. *Id.* In addition, plaintiff continued to experience frequent flashbacks and nightmares, night sweats, a "debilitating inability to sleep," "debilitating pain from his untreated, damaged facial nerves," "survivor's guilt," and had a death wish. *Id.* at 24. Plaintiff attempts to corroborate this change through affidavits of his stepdaughters. *See id.* at 17–22. However, plaintiff's 1967–1973 medical records,

---

1. Although the administrative record contains no document regarding the orders of the President of the Court of Inquiry, plaintiff has provided a copy of the Declaration of Wade Boston, Jr., Captain, JAGC, USN (Ret.) (Boston Decl. or Declaration), counsel to the Court of Inquiry, that states that the President of the Court of Inquiry

told counsel "that he had been ordered to 'put the lid' on everything having to do with the attack on the U.S.S. Liberty. We were never to speak of it and we were to caution everyone else involved that they could never speak of it again." Boston Decl. ¶ 18.

which were official records of the Navy, do not reflect changes in his mental state or behavior. *See* AR at 29–43, 49–54. Plaintiff states, however, that he did not disclose these symptoms to his military superiors or the medics because he believed to do so would, among other things, "violate the silencing order issued to him and other Liberty crew members." *Id.* at 24.

Plaintiff received performance ratings, consisting of numerical evaluations for professional performance, military behavior, leadership and supervisory ability, military appearance, and adaptability, in an Enlisted Performance Record, beginning in October 1967. AR at 64. There are also occasional descriptions of his performance contained in the Enlisted Performance Record and in Administrative Remarks. AR at 64; *id.* at 70. Plaintiff received a promotion in 1967, following the attack on the U.S.S. Liberty. *Id.* at 71. The BCNR decision takes the view that plaintiff's performance records demonstrate that plaintiff continued to perform his duties satisfactorily for several years after the U.S.S. Liberty incident, and bases that determination in part on a second promotion the BCNR ascribes to plaintiff in 1973 that is not documented in the Administrative Record. *Id.* at 6 (BCNR Decision). Defendant summarizes the material describing plaintiff's performance contained in the Administrative Record by stating that plaintiff "had acceptable performance after the Liberty incident that declined over time." Def.'s Facts ¶ 11. The evidence for the views of the BCNR and defendant, however, is mixed.

First, plaintiff's numerical evaluations do not begin until October 16, 1967, a date after the June 1967 attack on the U.S.S. Liberty. AR at 64. The Enlisted Performance Record therefore does not itself demonstrate whether plaintiff's performance after the attack was at the same level as it had been prior to the attack.

Second, the numerical evaluations are not conclusive on the question of plaintiff's satisfactory performance subsequent to the Liberty incident. The first set of numerical evaluations contained in the Administrative Record demonstrate that plaintiff received an average rating of 3.6. *Id.* Plaintiff's numeri-

cal evaluations dropped across the board in May 1968 from their October 1967 levels. *Id.* An Administrative Remark dated May 16, 1968 stated that plaintiff was assigned a rating of 2.8 in military appearance due to soiled uniforms and general poor grooming. *Id.* at 70. The numerical evaluations rose again in November 1968, returning almost to October 1967 levels, and dropped slightly in May 1969. *Id.* at 64. In August 1969, the numerical evaluations rose slightly in two categories and dropped slightly in one. *Id.* Plaintiff's numerical evaluations rose in 1970 and again in 1971. The numerical evaluations dropped in 1972. *Id.*

The notes contained in the Enlisted Performance Record are similarly inconclusive. A note dated July 24, 1967, just after the Liberty attack, states that plaintiff is "recommended for [a promotion to] CTR2," *id.*, a promotion which plaintiff received on a December 14, 1967, *id.* at 71. The Enlisted Performance Record further states that plaintiff was recommended for advancement to CT1 on May 26, 1969 but that that recommendation was withdrawn on June 18, 1969. *Id.* at 64. The Enlisted Performance Record reflects that plaintiff was again recommended for CT1 on January 27, 1970. *Id.* The BCNR decision states that plaintiff was promoted to CT1 in 1973. *Id.* at 6. Both the Administrative Remarks and plaintiff's Enlisted Performance Record reflect that plaintiff was promoted in June 1970. *Id.* at 70 ("Advance to CTR1 effective on 01 Jun 70 . . . ."); *id.* at 64 (reflecting "rate" of CT1 as of June 16, 1970).

In the spring of 1972, the Navy revoked plaintiff's Top Secret security clearance for failure to pay his debts and declared plaintiff unfit for overseas duty. Compl. at 24–25. Plaintiff was temporarily assigned Radioman duties with a SeaBee unit. *Id.* at 25. Although advised to apply for a change of rating, plaintiff declined to do so and was transferred to the Navy station in San Francisco for discharge under circumstances that made him ineligible for reenlistment. *Id.* Plaintiff was found to be physically fit for separation from active duty, Defendant's Supplemental Response to This Court's Orders Dated April 3, and April 13, 2006 (Def.'s

Supp. Resp.), Exhibit C (February 6, 1973 Report of Medical Examination) at 2, and was honorably discharged on that date, AR at 62 (Record of Discharge); Def.'s Facts ¶ 4.

### C. Plaintiff's Disability Claims and Application for Correction of Records

On July 21, 1999, the Department of Veterans Affairs (VA) awarded plaintiff disability benefits for post-traumatic stress disorder (PTSD) with a ten percent disability rating. AR at 6–8; Def.'s Facts ¶ 6. On December 20, 2002, plaintiff filed with the BCNR an application for the correction of plaintiff's naval records to reflect disability retirement on account of PTSD. Def.'s Facts ¶ 7; Compl. at 31; *see* AR at 20 (Application for Correction of Military Record). In support of his claim, plaintiff provided the following: a letter from Dr. Richard F. Kiepfer, dated August 20, 1997, stating that PTSD could contribute to plaintiff's physical pain, AR at 27; a letter from the same doctor dated February 15, 1996, stating, "I understand that Mr. Six has suffered 'Post Traumatic' neurologic syndrome," *id.* at 28; plaintiff's 1967–1973 medical records, which did not indicate that plaintiff was suffering from any symptoms of PTSD, *see id.* at 29–43, 49–54; and medical records dated September 5, 2002 and October 11, 2002, *id.* at 55–59, stating that "P[atien]t has PTSD" and further stating that:

> Veteran has a long history of Chronic PTSD which started after he barely saved his life when in June of 1967, in the middle of the "Six day war" while on board the USS Liberty, they were attacked in the Mediterranean Sea[,] a torpedo hit the room he was in, and he was the only survivor out of 26 men. He has vivid memories of the water rushing in and covering his head, but does report dissociation of other details. . . .

> Since then he has experienced significant PTSD symptomatology, including a tremendous survivor's guilt. . . .

*id.* at 55, 57. The October 11, 2002 medical record further describes plaintiff's condition as "chronic PTSD with depressive features" and reflects a course of treatment including medication for his insomnia and nightmares and therapy. *Id.* at 58.

In further support of his claim, plaintiff provided affidavits from his stepdaughters describing plaintiff's drinking and marital problems and concluding that those problems were the result of his experience aboard the U.S.S. Liberty. AR at 44–48. Plaintiff also provided his own affidavit describing his experience aboard the U.S.S. Liberty, the alleged cover-up, and his subsequent nightmares, flashbacks, and physical pain. *Id.* at 12–19. Plaintiff states in his motion for the BCNR's reconsideration of his claim that the initial application contained a statement concerning the silencing order. *Id.* at 95 (referring to plaintiff's statement concerning the silencing order allegedly contained in plaintiff's initial application). Plaintiff's application provided in the Administrative Record does not contain a statement about the silencing order. *See id.* at 1–2, 12–28, 44–48, 55–60. Plaintiff also states that the original application contained the Affidavit of Bryce F. Lockwood, Former Gunnery Sergeant, U.S. Marine Corps. Plaintiff's Statement of Admissibility of Documents Filed with Plaintiff's Response (Pl.'s Statement of Admissibility) at 2. However, this document is not contained in the Administrative Record as filed by defendant.

### D. Decision of the BCNR

On August 25, 2003, the BCNR issued a decision denying plaintiff's claim, concluding that the evidence did not establish the existence of probable material error or injustice. AR at 6. The BCNR indicated that it had considered plaintiff's "application, together with all material submitted in support thereof, [plaintiff's] naval record and applicable statutes, regulations and policies." *Id.* The BCNR noted that, "despite the traumatic events [plaintiff] experienced in 1967, [plaintiff] continued to perform [his] duties in a satisfactory manner for several years thereafter," *id.;* that plaintiff was promoted subsequent to the Liberty incident, *id.;* that the Board "could not find any indication in the available records that [plaintiff] suffered from the hallmark symptoms of post[-]traumatic stress disorder during the period from 1967 to 1973," *id.;* and that plaintiff denied a

history of psychological complaints when he stated on an October 21, 1971 Report of Medical History that he did not have "a history of frequent trouble sleeping, frequent or troubling [2] nightmares, depression or excessive worry, or nervous trouble of any sort," *id.* at 7 (footnote added). The BCNR specifically "rejected [plaintiff's] . . . contention[ ] . . . that [plaintiff's] use of alcohol was related to the effects [of] undiagnosed and untreated posttraumatic stress disorder." *Id.* The BCNR further found that "[t]he fact that the Department of Veterans Affairs (VA) granted [plaintiff] service connection and a 10% rating for posttraumatic stress disorder on 21 July 1999 was not considered probative" because "the military departments assign disability ratings only in those cases where a service member has been found unfit for duty by reason of physical disability, whereas the VA rates all conditions it classifies as 'service connected', without regard to the issue of fitness for military duty." *Id.* The BCNR determined that the evidence presented did not establish that plaintiff suffered from post-traumatic stress disorder at the time of his discharge. *Id.* The BCNR stated, however, "that [plaintiff was] entitled to have the BCNR reconsider its decision upon submission of new and material evidence. . . ." *Id.* at 7–8.

E. Decision of Executive Director on Reconsideration

On July 15, 2004, plaintiff filed a motion for reconsideration of the BCNR's decision. AR at 79–99. In support of his claim, plaintiff provided Dr. Yuval Estrov's Psychiatric Report dated April 29, 2004 (Estrov Report); plaintiff's supplemental affidavit; a letter from plaintiff to his counsel answering questions to assist counsel in preparing the application for reconsideration; and various regulations and descriptions of diagnosis with PTSD on which the Navy typically relies. *Id.* at 100–49. The Estrov Report states, "It is my professional opinion that Mr. Six suffers from post traumatic stress disorder. I also believe that criteria for the diagnosis were met during active duty from 1968 and

contributed to disability at the time of discharge in February, 1973." *Id.* at 107. Plaintiff argues that the BCNR "fail[ed] to address the chilling effect of the Navy's silencing order," which would explain an absence of symptoms of PTSD in the contemporaneous medical record. *Id.* at 95.

On July 23, 2004, the Executive Director of the BCNR denied plaintiff's motion for reconsideration. *Id.* at 10–11. The regulations require the submission of evidence that is both new and material in support of a motion for reconsideration. 32 C.F.R. § 723.9 (2005). The Executive Director found that, "[a]lthough some of the [documentation] submitted in support of [plaintiff's] request may be considered new, although it appears that it was reasonably available when [plaintiff] submitted [his] original application in 2002," the newly provided Estrov Report was not "material, as that term is defined in Secretary of the Navy Instruction 5420.193, . . . section (9)." AR at 10. The Executive Director found that the Estrov Report was not material because "[Dr. Estrov] based his opinion, in large part, on his acceptance of [plaintiff's] representations concerning the symptoms of post[-]traumatic stress disorder [plaintiff] allegedly began to experience in 1967" and that "the Board [had] rejected those representations [in its decision denying plaintiff's application]." *Id.* The Executive Director concluded that, because the BCNR had rejected the representations on which Dr. Estrov's diagnosis was based, "[t]here is nothing in [plaintiff's] affidavit or the [Estrov Report] that would warrant a change in the Board's rejection of [plaintiff's] contentions." *Id.* The Executive Director did not address plaintiff's allegations concerning the effect of the silencing order. *See id.*

F. Proceedings in This Court

Plaintiff filed his complaint in this court on December 2, 2004. On May 3, 2005, defendant filed its Motion for Summary Judgment, or, in the Alternative, for Judgment Upon the Administrative Record (Def.'s Mot. or motion), arguing that defendant is entitled

---

**2.** The word "troubling" in the BCNR decision differs from the October 21, 1971 Report of Medical History, which contained the word "terrify-

ing." *Compare* AR at 7 (BCNR Decision) *with* Def.'s Supp. Resp., Exhibit A (October 21, 1971 Report of Medical History) at 3.

to summary judgment because plaintiff's claim is barred by the doctrine of laches and, in the alternative, that defendant is entitled to judgment on the administrative record because the BCNR "was not arbitrary or capricious and did not prejudicially violate the law when it found that the record before it did not show that [plaintiff] suffered from PTSD as a result of his military service [at the time of his discharge]." Def.'s Mot. at 10–11. Defendant's Statement of Facts (Def.'s Facts) and Defendant's Motion for Leave to File the Administrative Record accompanied the motion. The Administrative Record filed by defendant on May 3, 2005 contained records considered by the BCNR in its initial consideration of plaintiff's request for correction of records. Defendant proposed to supplement the administrative record on October 3, 2005 with records before the Executive Director on reconsideration of plaintiff's application. Defendant's Motion for Leave to Supplement the Administrative Record. The supplement contains plaintiff's application on reconsideration and attachments thereto provided by plaintiff. Supplement to the Administrative Record (AR 79–150). By orders dated May 11, 2005 and October 4, 2005, the court granted defendant's motions for leave to file the administrative record and proposed supplement. Plaintiff filed his Memorandum in Opposition to Defendant's Motion for Summary Judgment, or, in the Alternative for Judgment Upon the Administrative Record (Pl.'s Resp. or response), accompanied by his Proposed Counter Statement of Facts (Pl.'s Facts) and supplemental declarations and proposed exhibits on January 19, 2006. The declarations had not been submitted to the BCNR in support of plaintiff's application and therefore had not been considered by the BCNR. Many of the declarations were submitted without original signatures. In addition, the declarations and articles are considered hearsay and also must be authenticated under the Federal Rules of Evidence applicable in this court. The court therefore directed plaintiff to re-file the declarations with origi-

nal signatures and to file a statement describing the admissibility of each document and identifying a particular Rule of Evidence or exception to a Rule of Evidence on which plaintiff relied to support plaintiff's assertion of admissibility. Order of January 19, 2006. Plaintiff filed his Statement of Admissibility of Documents Filed with Plaintiff's Response[3] (Pl.'s Statement of Admissibility) at the direction of the court on February 7, 2006. The court addresses the admissibility of the supplemental declarations and proposed exhibits in Part II.D below.

Defendant filed its Reply to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, or, in the Alternative, for Judgment Upon the Administrative Record (Def.'s Reply) on January 30, 2006.

On April 3, 2006, the court issued an order directing defendant to file records upon which the BCNR explicitly stated that it relied in denying plaintiff's application for correction of records but which were not included in the Administrative Record or Supplement filed by defendant. Order of April 3, 2006. Specifically, the court directed defendant to provide the October 1971 medical examination; the August 8, 1972 psychiatric consultation; and the clinical evaluation dated February 6, 1973. *Id.* The court also directed defendant to file "any and all other records relied on by defendant in reaching its decision to deny plaintiff's application for correction of his naval record." *Id.* On April 28, 2006, defendant provided the Declaration of [Head of the Disability Section of the BCNR] James R. Exnicios (Exnicios Declaration), which stated that "[o]n August 26, 2003, while preparing the record of the Board proceedings for permanent filing and disposing of copies of records that the Board would no longer need, I or one of the Board staff members[ ] inadvertently disposed of the Board's copies of the October 1971, August 8, 1972, and February 6, 1973 medical records." Exnicios Decl. ¶ 4. Defendant indicated, how-

---

3. Plaintiff attempted to file a response to defendant's reply on February 7, 2006. Because there is no provision in the Rules of the Court of Federal Claims (RCFC) for the filing of a response to a reply without leave of the court, and because plaintiff did not seek leave by motion stating specific reasons why justice would require that such leave be granted, the court returned plaintiff's responsive motion unfiled by Order dated February 14, 2006.

ever, that it "ha[d] requested copies of the original medical records from a records repository." Defendant's Response to the Court's Order Dated April 13,[4] 2006, and Unopposed Motion for Enlargement of Time at 1. On May 19, 2006, defendant filed copies of the October 1971 medical examination and the February 6, 1973 clinical evaluation. Defendant was unable to provide a copy of the August 4, 1972 psychiatric record referenced by the BCNR in its denial decision. *See* Def.'s Supp. Resp. at 1–2 ("[T]he only psychiatric record that is available is the August 4, 1972, record that is already included in the administrative record at pages 53–54. The Navy's best information is that any records kept of the August 8 consultation with a psychiatrist were either destroyed, as reported by Mr. Exnicios in his April 27, 2006, affidavit filed with this Court on April 28, or simply cannot be located at this time.").

For the reasons discussed below, the court DENIES defendant's motion for summary judgment, DENIES defendant's motion for judgment on the administrative record, and REMANDS this case to the BCNR for consideration of the record in light of the alleged silencing order.

## II. Discussion

### A. Jurisdiction

The Tucker Act, 28 U.S.C. § 1491 (2000), confers jurisdiction on this court "to render judgment upon any claim against the United States founded ... upon ... any act of Congress or any regulation of an executive department...." 28 U.S.C. § 1491(a)(1) (2000). The Tucker Act does not itself provide the substantive cause of action, *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed.Cir.2003) (en banc); rather, in any particular case, payment must be mandated by an independent source of substantive law, *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed.Cir. 2005) (*Fisher II*); *Chambers v. United States*, 417 F.3d 1218, 1223 (Fed.Cir.2005) (quoting *Martinez*, 333 F.3d at 1303). Al-

though equitable remedies are generally unavailable in this court, equitable relief "as an incident of and collateral to" a requested legal remedy is available "to provide an entire remedy and to complete the relief afforded by the judgment." 28 U.S.C. § 1491(a)(2). "Placement in appropriate duty or retirement status" is one of the examples provided. *Id.; see Haskins v. United States*, 51 Fed.Cl. 818, 822 (2002).

Plaintiff asserts that the independent source of substantive law that confers jurisdiction on this court to convert plaintiff's discharge to a military retirement with accompanying retirement pay and benefits is 10 U.S.C. § 1201 (2000). Compl. at 2; Pl.'s Resp. ¶ 5. Section 1201, governing retirement for disability, mandates the payment of retirement pay once a disability is found qualifying. 10 U.S.C. § 1201; *Chambers*, 417 F.3d at 1223 (identifying 10 U.S.C. § 1201 as a "money-mandating statute"); *Fisher v. United States*, 364 F.3d 1372, 1379 (Fed.Cir. 2004) (*Fisher I*), rev'd on other grounds, 402 F.3d 1167 (Fed.Cir.2005) ("[Section] 1201 is reasonably amenable to the reading that it is money-mandating.... Despite the presence of the word 'may' in the statute, in *Sawyer [v. United States*, 930 F.2d 1577, 1580 (Fed. Cir.1991)], we determined that the Secretary has no discretion whether to pay out retirement funds once a disability is found qualifying. Thus, the statute is money-mandating because when the requirements of the statute are met ... [,] the member is entitled to compensation."); *see also Haskins*, 51 Fed. Cl. at 822 (reviewing legislative history of 1972 amendment to the Tucker Act). Because plaintiff has pleaded facts that, if proved, may entitle him to relief, this court has jurisdiction to entertain his claim.

### B. Standards of Review for Summary Judgment and Judgment on the Administrative Record

#### 1. Summary Judgment

Defendant has moved for summary judgment pursuant to Rule 56 of the Rules of the

---

4. Defendant presumably meant to refer to the court's Order of April 3, 2006. The court also issued an order on April 13, 2006, but this was an order granting defendant's motion for extension of time to file the requested documents.

Court of Federal Claims (RCFC), or, in the alternative for judgment on the administrative record pursuant to RCFC 56.1. Def.'s Mot. at 1–11. A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." RCFC 56(c). A fact is "material" if it might significantly affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the moving party has not disputed any facts contained in the non-movant's pleadings, the court assumes all well-pleaded facts to be true and draws all applicable presumptions and inferences therefrom in favor of the non-moving party. *See Univ. Bd. of Trs. v. VanVoorhies*, 278 F.3d 1288, 1295 (Fed.Cir.2002); *see also Banks v. United States*, 69 Fed.Cl. 206, 209 (2006). In addition, the court views "the inferences to be drawn from the underlying facts ... 'in the light most favorable to the [non-moving] party,'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

### 2. Judgment on the Administrative Record

A motion for judgment on the administrative record is now governed by RCFC 52.1. Rule 52.1, by amendment to the RCFC effective June 20, 2006, replaced Rule 56.1, under which defendant has moved.[5] It does not appear that, except procedurally, with respect to the form of briefing, the disposition of this case is affected by differences between Rule 52.1 and superseded Rule 56.1.

A motion for judgment on the administrative record is "distinguish[able]" from a motion for summary judgment. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir.2005); *see Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1372 (Fed.Cir.2006) (stating that a motion for judgment on the administrative record is "not akin" to a mo-

tion for summary judgment). An absence of dispute as to all material facts is not required to decide a case on the basis of the administrative record. *Bannum*, 404 F.3d at 1355; *Precision Standard, Inc. v. United States*, 69 Fed.Cl. 738, 743 (2006); RCFC 52.1 rules committee note (2006) (stating that judgment on the administrative record does not require an absence of material fact). Questions of fact are resolved by weighing the evidence present in the administrative record, as properly supplemented. *Bannum*, 404 F.3d at 1356–57 (describing supplementation of administrative record to resolve questions of fact in context of bid protest); *accord Precision Standard*, 69 Fed.Cl. at 743 (same); *see Beckham v. United States*, 179 Ct.Cl. 539, 375 F.2d 782, 785 (1967) (finding supplementation of administrative record appropriate in context of claim for military retirement pay). Alternatively, the court may remand the case to the Board where the Board did not find all facts necessary for a resolution of the plaintiff's claim. 28 U.S.C. § 1491(a)(2); *Santiago v. United States*, 71 Fed.Cl. 220, 230 (2006).

A judgment of a board for correction of military records will only be overturned if the decision is arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations. *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed.Cir.1983). Under the substantial evidence rule, however, "*all* of the competent evidence must be considered, whether original or supplemental, and whether or not it supports the challenged conclusion." *Id.* at 1157; *see Williams v. United States*, 130 Ct.Cl. 435, 127 F.Supp. 617, 619 (1955) ("The fact that there is evidence, considered of and by itself, to support the administrative decision is not sufficient where there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial on the record as a whole."). Where the Board did not consider or address evidence before it that may have had the effect of changing the result, the court may

---

**5.** RCFC 83(a) states that "[a] rule takes effect on the date specified by the court." *See* Notice of Adoption of Amendments to Rules of the United States Court of Federal Claims at 1 (June 20, 2006), *available at* http://www.uscfc.uscourts.gov/rules.htm (stating that the effective date of the amended rules is June 20, 2006).

680

remand for consideration of that evidence. *Istivan v. United States*, 231 Ct.Cl. 671, 689 F.2d 1034, 1038–39 (1982) (remanding military disability retirement pay claim to Board where Board failed to provide explanation for its actions); *Santiago*, 71 Fed.Cl., at 230 (remanding to Board where Board did not consider or address the plaintiff's "end-organ damage" in rating the plaintiff's disabilities); *see Kirwin v. United States*, 23 Cl.Ct. 497, 502 (1991) (stating that, in order to prevail under the applicable standard of review, a plaintiff "must demonstrate 'that the personnel involved ignored relevant and competent evidence, that they unreasonably construed the significant body of medical documents before them, or that in [some] other manner they failed to discharge their designated duties.' ") (quoting *O'Neil v. United States*, 6 Cl.Ct. 317, 319 (1984)).

■ A plaintiff in a military pay case is "entitled" to supplement the administrative record with additional evidence. *Heisig*, 719 F.2d at 1157; *see King v. United States*, 65 Fed.Cl. 385, 391 n. 7 (2005); *Greene v. United States*, 65 Fed.Cl. 375, 382 n. 3 (2005) ("Our Court's convention of restricting review to the administrative record seems to conflict with the express holding of the Federal Circuit that plaintiffs challenging Correction Board determinations are 'entitled' to supplement this record with additional evidence." (quoting *Heisig*, 719 F.2d at 1157)); *Brooks v. United States*, 65 Fed.Cl. 135, 150 n. 22 (2005); *cf. Bray v. United States*, 207 Ct.Cl. 60, 515 F.2d 1383, 1390 (1975) (stating that, "[i]n military pay cases such as this judicial review is not limited to the administrative record" and that the plaintiff in such a case "is entitled to a trial on the merits, as a matter of right, so that he may have a judicial determination of the disputed factual issues involved in his claim"); *Montilla v. United States*, 198 Ct.Cl. 48, 457 F.2d 978, 982–83 (1972) (recognizing right of plaintiff to trial to permit "judicial determination of the disputed factual issues" in military retirement pay case); *Long v. United States*, 12 Cl.Ct. 174, 175–76 (1987) (limiting ability to supplement the administrative record in a military pay case to cases involving military disability retirement pay and recognizing continued ability of the court to supplement

the administrative record in military disability retirement pay cases). "In the subcategory of disability retirement claims, the law is clear that a plaintiff is entitled to supplement the administrative record, *inter alia*, to fill any gaps in the record and to provide post-separation information." *Lyons v. United States*, 18 Cl.Ct. 723, 727 (1989); *see Long*, 12 Cl.Ct. at 175–76. If the plaintiff offers new evidence, the court considers both the record and the de novo evidence to determine whether the decision of the Board is supported by substantial evidence. *Beckham*, 375 F.2d at 785.

C. Whether Defendant Is Entitled to Summary Judgment on the Ground That Plaintiff's Claim is Barred by Laches

Defendant argues that this court should grant summary judgment in defendant's favor because plaintiff's claim is barred by the doctrine of laches. Defendant contends that "Mr. Six was fully aware of his serious mental health issues at the time of his discharge in February 1973" and that, "[a]t discharge, [plaintiff] was aware that he was not receiving retirement disability benefits." Def.'s Mot. at 5. Defendant argues that plaintiff's delay of more than thirty years has prejudiced defendant because "[t]he passage of time makes it far more difficult to determine whether Mr. Six was fit for duty at the time of his discharge in February 1973" or whether "Mr. Six's alleged harm" occurred "in the intervening years." *Id.* Defendant also argues that it is prejudiced in bringing its defense. Specifically, defendant argues that testimony of any prospective witnesses would be "problematic" because, "assuming they are still alive, witnesses would be required to recall events from several decades ago." *Id.*

Plaintiff argues that summary judgment would be inappropriate because "[t]o evaluate the [applicability of] the doctrine of laches on the facts here involved would require resolution of facts in dispute." Pl.'s Resp. at 3. Specifically, "[p]laintiff asserts that [the] [s]ilencing [o]rder denied him the ability to disclose his disabling PTSD to the separation personnel in 1972 and 1973 and continued to block him from discussing his illness." Pl.'s

Resp. at 4. In addition, plaintiff argues that the doctrine of laches is inapplicable in this context because "defendant's unclean hands"—in the form of "[d]efendant[']s knowingly false report and its [s]ilencing [o]rder"—"bar the government from invoking the doctrine [of laches]." *Id.* Furthermore, plaintiff argues, the BCNR reviewed plaintiff's record and reached its conclusions without claiming that it was unable to review plaintiff's record due to material prejudice caused by the passage of time and that the BCNR failed to "den[y] review for any reason."

■ Absent "extraordinary circumstances," *United Enter. & Assocs. v. United States,* 70 Fed.Cl. 1, 21 (2006) (*UEA*) (quoting *CW Gov't Travel, Inc. v. United States,* 61 Fed.Cl. 559, 569 (2004)), the court generally refuses to invoke the doctrine of laches to dismiss claims whose limitation period has been set by statute and has not run, *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.,* 988 F.2d 1157, 1161 (Fed.Cir. 1993); *UEA,* 70 Fed.Cl. at 22 (holding that defendant had not established the extraordinary circumstances necessary to warrant the reading of a shorter statute of limitations into the Tucker Act). Section 1201 does not limit the period during which a plaintiff may bring suit beyond the six-year statute of limitations prescribed by the Tucker Act. 10 U.S.C. § 1201. Under the Tucker Act, plaintiffs must bring suit in this court "within six years after such claim first accrues." 28 U.S.C. § 2501 ("[E]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."). Claims for disability retirement pay accrue at the time when the appropriate military board "either finally denies [the] claim or refuses to hear it." *Chambers,* 417 F.3d at 1224; *Real v. United States,* 906 F.2d 1557, 1560 (Fed.Cir. 1990) ("The decision by the first statutorily authorized board which hears or refuses to hear the claim is the triggering event." (emphasis added)); *see Chambers,* 417 F.3d at 1225 (explaining the rationale behind this rule as being that "the claim does not ripen until that Board's action is final" so that the "Correction Board proceeding becomes 'a

mandatory remedy.'" (quoting *Friedman v. United States,* 310 F.2d at 392)). Where, as here, Congress has not limited the time in which a claim of entitlement to disability retirement pay may be brought beyond the general six-year statute of limitations applicable to Tucker Act suits, the court "is reluctant to invoke laches except under extraordinary circumstances." *UEA,* 70 Fed.Cl. at 22 (quoting *CW Gov't Travel,* 61 Fed.Cl. at 569). Defendant has not alleged extraordinary circumstances.

■ Plaintiff's claim has been brought within the applicable six-year limitation period established by statute. 28 U.S.C. § 2501. Plaintiff's claim accrued on August 25, 2003 when the BCNR issued a decision denying plaintiff's claim. *See Chambers,* 417 F.3d at 1224–25 (claim accrues once Board's action is final). Plaintiff filed suit on December 2, 2004, a date within six years of the BCNR's August 25, 2003 final action. Because there is a statute of limitations applicable to plaintiff's claim and because plaintiff filed within the time period prescribed by that statute, the court declines to apply the doctrine of laches to dismiss plaintiff's claims.

Even if the court were to entertain defendant's claim that the doctrine of laches applied to bar plaintiff's claims, defendant would not be able to establish the requisite elements of such a claim. In order to establish the affirmative defense of laches, the defendant must show that "1) the plaintiff delayed filing suit for an unreasonable and inexcusable length of time *from the time he knew or reasonably should have known of his claim against the defendant;* and 2) the delay operated to the prejudice or injury of the defendant." *Poett v. Merit Sys. Prot. Bd.,* 360 F.3d 1377, 1384 (Fed.Cir.2004) (emphasis added); *JANA, Inc. v. United States,* 936 F.2d 1265, 1269–70 (Fed.Cir.1991); *UEA,* 70 Fed.Cl. at 21. "[L]aches ... require[s] that prejudice results from the delay." *Meyers v. Asics Corp.,* 974 F.2d 1304, 1308 n. 1 (Fed.Cir.1992). "The burden of proof is on the party that raises the affirmative defense." *Advanced Cardiovascular,* 988 F.2d at 1161. "In the summary judgment context, a party raising the laches defense must also

establish that there are no genuine issues of material fact with respect to either delay or prejudice." *UEA,* 70 Fed.Cl. at 21; *see also Wanlass v. Gen. Elec. Co.,* 148 F.3d 1334, 1337 (Fed.Cir.1998). "The mere passage of time, without more, does not constitute laches." *UEA,* 70 Fed.Cl. at 21; *Bannum, Inc. v. United States,* 60 Fed.Cl. at 718, 728 (2004).

Defendant cannot establish on summary judgment that "plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time he knew or reasonably should have known of his claim against the defendant." *Poett,* 360 F.3d at 1384; *cf. Barrett v. Principi,* 363 F.3d 1316, 1318 (Fed.Cir.2004) (declining "to rigidly implement" the statute of limitations where plaintiff suffered from PTSD "because the condition prevent[ed] [plaintiff] from timely filing"). Plaintiff alleges that the silencing order operated to prevent plaintiff from discussing his symptoms with doctors. To the extent that the alleged silencing order prevented plaintiff from receiving a diagnosis of PTSD at or before the time of discharge, plaintiff cannot be said to have delayed filing suit for an unreasonable or inexcusable length of time from the time he knew or reasonably should have known of his diagnosis. The court accordingly DENIES defendant's motion for summary judgment on the ground of laches.

### D. Supplementation of the Administrative Record

Plaintiff submitted supplemental documentation in support of his claim which accompanied his response to defendant's motion. This supplemental documentation was not provided in plaintiff's original application before the BCNR or on reconsideration. Plaintiff proposes to file the following supplemental documentation: the Statement of RADM Merlin Staring, JAGC, USN, Retired (Staring Statement); the Declaration of Wade Boston, JAGC, USN, Retired (Boston Declaration); Memorandum of John Stetson, National Naval Medical Center, to the Chairman of the BCNR regarding one of plaintiff's shipmates (Stetson Memorandum); the Declaration of Richard Kiepfer (Kiepfer Declaration); the Declaration of Joe Binkert (Binkert Declaration); the Declaration of Former CT3 Chuck Jones (Jones Declaration); the Declaration of Harold Eugene Six, Sr. (Six Declaration); the Declaration of Mrs. Margaret Six (Margaret Six Declaration); the Unsigned Statement of Unidentified Former Radioman (Radioman Statement); and articles from medical journals regarding the psychological effects of war and symptoms of PTSD enclosed with the Kiepfer Declaration. In response to the court's order of January 19, 2006, plaintiff filed Plaintiff's Statement of Admissibility of Documents Filed with Plaintiff's Response. The court construes the supplemental documents provided along with plaintiff's Statement of Admissibility of Documents as a motion to supplement the administrative record. As discussed more particularly below, plaintiff's proffered statements and declarations "fill ... gaps" in plaintiff's 1967–1973 medical record by providing evidentiary support for an explanation as to the lack of any description of symptoms of PTSD in that record. *See Lyons,* 18 Cl.Ct. at 727.

### 1. Declarations of Admiral Staring and Captain Boston

Plaintiff proposes to introduce into evidence declarations of Admiral Staring and Captain Boston as agents of the government who assisted in the preparation of the report of the Court of Inquiry (in the case of Captain Boston) and the review of the record of the investigation by the Court of Inquiry (in the case of Admiral Staring) to prove that the report was false and that the methods which defendant used to promulgate the report were irregular. Captain Boston was assigned to the Navy's Court of Inquiry as Senior Legal Counsel. Boston, Decl. ¶ 3. Captain Boston, alongside President of the Court of Inquiry Admiral Isaac C. Kidd, "gather[ed] evidence for the Navy's official investigation into the [Liberty] attack." *Id.* ¶ 4. Admiral Staring was the senior Navy legal officer in London at the headquarters of Admiral John S. McCain, Jr., then-Commander-in-Chief of the U.S. Naval Forces in Europe. Staring Statement at 1. Admiral McCain was in command of U.S. Naval Forces in the Mediterranean. *Id.* Admiral

Staring began a review of the record of the investigation by the Court of Inquiry "to prepare a recommended action on that record for Admiral McCain." *Id.* The Staring Statement and Boston Declaration state that, based on their investigation and review, the evidence yielded the opposite result from that published. *See, e.g.,* Boston Decl. at 1. Because the Staring Statement and Boston Declaration provide evidence regarding facts that, if proved, would establish that the symptoms plaintiff describes could not be learned from plaintiff's 1967–1973 medical record, the court ADMITS these two statements into evidence for the purpose of supplementing the administrative record.

### 2. Stetson Memorandum

Plaintiff proposes to introduce into evidence the advisory opinion of the Naval Medical Center, authored by John Stetson, MAJ, USAF, MC, in the case of one of plaintiff's shipmates aboard the U.S.S. Liberty. Plaintiff states that "[t]his document is tendered, not for the truth of its contents, but for the fact of its existence, and the inferences to be drawn from the relationship between the date of its submission to the BCNR, and, the refusal of the BCNR to submit Six's record to Naval Medical authorities for an advisory opinion." Pl.'s Statement of Admissibility at 8. Because the Stetson Memorandum may establish the utilization of a procedure of obtaining advisory opinions in the reconsideration of applications to correct military records followed by the BCNR, the court ADMITS the Stetson Memorandum for the purpose of supplementing the administrative record.

### 3. Declarations of Shipmates

Plaintiff proposes to introduce into evidence declarations of his shipmates to corroborate plaintiff's account of the attacks aboard the U.S.S. Liberty, the falsity of the findings of the Court of Inquiry in its Report, the existence of the silencing order, and "the nature and severity of plaintiff's injuries sustained incident to th[e] attack." Pl.'s State-

ment of Admissibility at 8. Plaintiff cites Rules 601 and 602 of the Federal Rules of Evidence to support the evidentiary admissibility of the declarations. *Id.;* Fed.R.Evid. 601 (general rule of competency of witnesses); Fed.R.Evid. 602 (requirement that a witness possess personal knowledge of facts to which the witness testifies). Because the declarations tend to prove the existence of the silencing order, the magnitude of the attack, and the falsity of the Report of the Court of Inquiry, which facts, if proved, could explain why plaintiff's 1967–1973 medical record does not contain evidence of symptoms of PTSD, the court ADMITS for the purpose of supplementing the administrative record the signed [6] declarations of plaintiff's shipmates to establish the factual background and the validity of plaintiff's claim that he was under a silencing order.

### 4. Kiepfer Declaration and Medical Journal Articles

Plaintiff offers the Declaration of Dr. Kiepfer, the doctor aboard the U.S.S. Liberty at the time of the alleged attack, for the purpose of diagnosing plaintiff with PTSD. Pl.'s Statement of Admissibility at 10. Plaintiff also offers the Kiepfer Declaration to prove the existence of the silencing order and the falsity of the Report of the Court of Inquiry. Because the Kiepfer Declaration tends to prove the existence of the silencing order, the magnitude of the attack, and the falsity of the Report of the Court of Inquiry, the court ADMITS the Kiepfer Declaration for the purpose of proving facts of which Dr. Kiepfer has personal knowledge. *See* Fed. R.Evid. 602, 701. Plaintiff states that Dr. Kiepfer's testimony is "uniquely relevant" because Dr. Kiepfer can apply his medical knowledge to his personal observations of "the severity of the ... attack," the receipt of the silencing order, and its effect on members of the crew. Pl.'s Statement of Admissibility of Documents at 11; *see* Fed.R.Evid. 702. Because Dr. Kiepfer was present at the time of the attack, treated plaintiff's injuries and those of other crew members during and

---

6. The court declines to admit the unsigned declaration of the witness whom plaintiff's counsel was unable to identify.

following the attack, has had continued contact with plaintiff "in the intervening years," and has reviewed plaintiff's medical records, Dr. Kiepfer could apply his expertise to his observations to evaluate the effect of the attacks on Mr. Six. The court therefore ADMITS for the purpose of supplementing the administrative record the Declaration of Dr. Kiepfer and several related documents apparently generated by the U.S. Department of Veterans Affairs.

Plaintiff argues that the medical journal articles accompanying the Kiepfer Declaration [7] should be admitted because the articles provide "the basis for and reinforce Dr. Kiepfer's diagnosis of plaintiff's PTSD and his conclusion that plaintiff was severely disabled by the disease while on active duty, and, at the time of his discharge." Pl.'s Statement of Admissibility at 13. For those reasons, the court ADMITS the accompanying journal articles for the purpose of supplementing the administrative record.

### 5. Declarations of Plaintiff and Mrs. Margaret Six

Plaintiff offers the declarations of plaintiff and Mrs. Margaret Six. Plaintiff does not explain the purpose for which plaintiff offers these declarations beyond a general statement that "[these declarations] are relevant to the issues of the case." Pl.'s Statement of Admissibility at 10. Plaintiff's declaration corroborates the events described in the declaration of the unidentified radioman, describes the visit of the Navy Lieutenant Commander who issued the silencing order, and describes plaintiff's reaction to the attack during plaintiff's subsequent military service and continuing effects to the present day. The Margaret Six Declaration describes plaintiff's behavior beginning at the time of her marriage to plaintiff in 1978, plaintiff's reticence concerning the attack,

and the symptoms Mrs. Six states that she observes. Because the Six Declaration describes plaintiff's behavior which in turn provides a basis for evaluation of plaintiff's medical condition at the time of his discharge, the court ADMITS the Six Declaration for the purpose of supplementing the administrative record. Because the Margaret Six Declaration describes plaintiff's symptoms, which in turn provides a basis for corroborating plaintiff's alleged symptoms, the court ADMITS the Margaret Six Declaration for the purpose of supplementing the administrative record.

### 6. Unsigned Declaration of Unidentified Radioman

Plaintiff also offers the Declaration of an Unidentified Radioman for the purpose of highlighting the discrepancy between the Navy's official version of the attack and Six's shipmates' version and for the purpose of verifying plaintiff's role in the Liberty incident. Pl.'s Statement of Admissibility at 9. In particular, the statement describes the Navy's initial description of Six's role as a hero who rescued shipmates and Six's contemporaneous statement that he did not remember rescuing shipmates but that he had been instructed not to talk about the attack at all because the attack was highly classified and plaintiff could be subjected to a court-martial if he talked about it. Because the declarant is unidentified and because the declarant did not sign the statement, the court DENIES plaintiff's request to supplement the Administrative Record with the unsigned Declaration of an Unidentified Radioman.

### E. Whether Defendant Is Entitled to Judgment on the Administrative Record

■ Defendant moves for judgment on the administrative record. Defendant argues

---

7. Plaintiff also tenders a Veterans Benefit Administration Table, entitled Disability/Degree of Impairment and Type of Major Disability by Period of Service, September 30, 2002 (Table) and a Directive from the Department of Veterans Affairs entitled Provision of Medical Opinions by VA Health Care Practitioners (Directive). In Plaintiff's Statement of Admissibility, plaintiff identifies the articles enclosed with the Kiepfer Declaration. The Table and Directive were not

separately identified, however, nor did plaintiff provide a basis for their admissibility. See Pl.'s Statement of Admissibility at 3, 10–15. Government documents would normally be admissible, however, either as business records, Fed.R.Evid. 803(6), public records, Fed.R.Evid. 803(8), or, in the circumstances of this case, possibly as admissions by a party-opponent, Fed.R.Evid. 801(d)(2)(A) or (D).

that "the BCNR was not arbitrary or capricious and did not prejudicially violate the law when it found that the record before it did not show that Mr. Six suffered from PTSD as a result of his military service more than 30 years before," Def.'s Mot. at 10–11, because "there was no evidence in the record upon which the BCNR could have concluded that Mr. Six suffered from military-related PTSD," *id.* at 7. In support of its position, defendant argues, and the BCNR explicitly found, that there was no "indication in the available records that [Mr. Six] suffered from the hallmark symptoms of [PTSD] during the period from 1967 to 1973"; that Mr. Six himself "denied having a history of psychological complaints on . . . a Report of Medical History" completed in October 1971; and that Mr. Six "underwent psychiatric evaluation on 4 August 1972, and [was] given a diagnosis of an immature personality." *Id.* at 8 (quoting AR 6–7). Defendant also argues that performance evaluations over the course of Mr. Six's tenure in military service "show that Mr. Six had acceptable performance after the Liberty incident that declined over time." *Id.* at 10 (citing AR at 64–78).

Defendant further moves for judgment on the administrative record of its decision denying plaintiff's motion for reconsideration. Def.'s Mot. at 8. In support of its position, defendant argues that "Mr. Six did not submit evidence from medical professionals that would have compelled the BCNR to have found [that Mr. Six suffered from military-related PTSD at the time of his discharge]." *Id.* at 9. Although Mr. Six provided a report from Dr. Yuval Estrov diagnosing plaintiff with PTSD retroactive to the time of his service and discharge, defendant argues that the Executive Director was not required to rely on the Estrov Report in rendering its decision on reconsideration because "Dr. Estrov's statements were based 'in large part, on [the psychiatrist's] acceptance of [Mr. Six's] representations concerning the symptoms of [PTSD]' which the BCNR had previously rejected."

Plaintiff argues that judgment on the administrative record is inappropriate because "genuine issues for trial" remain. Pl.'s Resp. at 16–17. Plaintiff specifically alleges that he was under a silencing order and that he did not discuss his symptoms with his doctors in compliance with that order. Compl. at 8–9; AR at 115. As described in Part II.D above, plaintiff provided additional affidavits to support his allegation of the existence of the silencing order and to support his allegation that his symptoms and behavior in 1967–1973 evidenced symptoms of PTSD. *See supra* Part II.D. Plaintiff also provided medical records that diagnosed him with PTSD, tracing the PTSD to the time of his military service. *Id.* Those medical records contain detailed descriptions of the basis for the findings. *Id.* Taken together, this evidence provides a basis for reconsideration of the BCNR's decision. *See Heisig,* 719 F.2d at 1157 (stating that, under the substantial evidence rule, "*all* of the competent evidence must be considered . . . , whether or not it supports the challenged conclusion."); *Williams,* 127 F.Supp. at 619 ("The fact that there is evidence, considered of and by itself, to support the administrative decision is not sufficient where there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial on the record as a whole."); *Istivan,* 689 F.2d at 1038–39 (Ct.Cl.1982) (remanding for reconsideration where Board failed to provide explanation for its actions); *Santiago,* 71 Fed. Cl., at 230 (remanding where Board did not consider or address the plaintiff's "end-organ damage" in rating the plaintiff's disabilities).

Plaintiff argues first that the BCNR and Executive Director abused their discretion in failing to consider plaintiff's claim that he was prevented from disclosing his PTSD by defendant's silencing order and for "fail[ing] to articulate the reasons for ignoring this material evidence." Pl.'s Resp. at 15. Plaintiff states that he was "proscribed" by the silencing order "from reporting his symptoms" because, "[t]o explain his symptoms, [he] would necessarily have had to discuss . . . his experiences in the attack on the Liberty" in violation of the silencing order. *Id.* at 16. Plaintiff also argues that the contemporaneous medical records themselves—including the February 1971 evaluation and the 1972 Report of Medical History—contain omissions which alert medical experts to the fact that they fail to tell the

complete story and that the evaluations were based on incomplete information. *Id.* at 11–12. Specifically, plaintiff states that, as Dr. Estrov noted, the examiner's conclusion contained in plaintiff's 1972 psychiatric consultation stated that the examiner needed to review other records, not then available to him, before a diagnosis could be established, *id.* at 11 (citing Estrov Report, AR at 108); that a failure to note Six's affect, which is a fundamental component of a psychiatric examination, *id.* at 12 n. 4, supports an inference that "the first evaluator was troubled by Six's affect and demeanor," *id.* at 12; and that "it can also be fairly inferred that the evaluator was troubled by omissions of psychiatric significance in Six's available medical records," *id.*

Neither the initial decision of the BCNR nor the Executive Director's decision on reconsideration addresses plaintiff's allegations of a silencing order. Nor does defendant address the silencing order in its motion for judgment on the administrative record, a silence which suggests that, to defendant, the question of the existence of a silencing order is irrelevant to a determination of whether plaintiff had disabling PTSD at the time of his discharge from the Navy. Defendant apparently expects this court to determine that the decisions of the BCNR and the Executive Director were based on substantial evidence in the absence of such consideration. However, because the existence of the silencing order could explain the lack of contemporaneous medical evidence on the record which could form the basis for a diagnosis of PTSD and therefore casts doubt on the accuracy of the contemporaneous medical record, the question of the existence of the alleged silencing order is directly relevant to the question of whether plaintiff had disabling PTSD at the time of his discharge. Because the BCNR and the Executive Director do not appear to have considered plaintiff's allega-

tions, the BCNR cannot be said on this record to have considered all the evidence.[8] *See Santiago,* 71 Fed.Cl., at 229–230 ("[T]he complete absence of any indication from the [Physical Evaluation Board] as to its consideration of these matters casts doubt upon its decision to disregard hypertension in rating Ms. Santiago's disabilities.").

### III. Remand

The Tucker Act authorizes this court "to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." 28 U.S.C. § 1491(a)(2); *see* RCFC 52.2;[9] *accord Harris v. United States,* 8 Cl.Ct. 299, 303 (1985). RCFC 52.2 describes the procedure according to which this court may execute its remand authority. "An order of remand shall (A) delineate the area of further consideration or action deemed warranted on the remand, (B) fix the duration of the remand period, not to exceed 6 months, and (C) specify the extent to which court proceedings shall be stayed during the remand period." RCFC 52.2(a)(2).

Based on the absence of any indication that the BCNR considered evidence which, if proved, would cast doubt on the accuracy of the 1967–1973 medical record, the court REMANDS plaintiff's claim to the BCNR. The BCNR is specifically directed to consider plaintiff's claim in light of the alleged silencing order. If the BCNR finds that plaintiff was under a silencing order, justice requires that the BCNR rely on medical evaluations made after plaintiff's separation from the Navy and affidavits describing plaintiff's behavior at the time of the alleged incident, during plaintiff's 1967–1973 military service, at the time of his discharge and subsequently to determine whether plaintiff suffered from disabling PTSD at the time of his discharge. If plaintiff is found to have been under a silencing order in 1967–1973, justice also re-

---

**8.** The Administrative Record does not refer to the alleged silencing order. Plaintiff states that the allegation of the silencing order was before the BCNR. *Compare, e.g.,* Pl.'s Resp. at 15 with AR 1–78. It is immaterial, however, whether the alleged silencing order was before the BCNR because the court must consider all the evidence—both record evidence and evidence presented de novo—in determining whether sub-

stantial evidence supports the BCNR's conclusion. *See Beckham v. United States,* 179 Ct.Cl. 539, 375 F.2d 782, 785 (1967).

**9.** RCFC 52.2 replaced RCFC 56.2 effective June 20, 2006. *See supra* note 5. There are no material changes effected by the replacement.

quires that the BCNR avoid making a negative inference based on the absence of PTSD-consistent symptoms and behavior in plaintiff's 1967–1973 medical record. The BCNR shall consider affidavits submitted to this court by plaintiff and shall consider plaintiff's naval record in its entirety—including any records of the Shore Patrol—in addition to the 1967–1973 medical record and performance evaluations. The fact that PTSD was not a recognized syndrome diagnosis in 1967–1973 shall not act as a bar to the correction of plaintiff's military record if the BCNR finds that plaintiff exhibited behaviors consistent with PTSD in the 1967–1973 time period and subsequently.

The BCNR shall have 180 days from the date of this Opinion and Order to make its determination. RCFC 52.2(a)(2)(B). The BCNR shall file with the court its decision on remand within fourteen days of the date of issuance of its decision. The attorney of record for defendant shall report on the status of proceedings on remand at intervals of no longer than sixty days beginning with the sixtieth day after the date of this order, until the decision on remand has been completed and the resulting opinion has been filed with the court. RCFC 52.2(a)(5). The matter shall be STAYED during the remand period. RCFC 52.2(a)(2)(C). The Clerk of Court shall SERVE a certified copy of this Order and Opinion on the Board for Correction of Naval Records. RCFC 52.2(a)(3).

IV. Conclusion

For the foregoing reasons, the court DENIES defendant's motion for summary judgment and DENIES defendant's motion for judgment on the administrative record. The court REMANDS plaintiff's claim to the BCNR for review with direction as provided in Part III of this opinion.

IT IS SO ORDERED.